THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HERBERT R. WHITLOCK, Defendant-Appellant.

Fourth District   No. 4—87—0565

Opinion filed September 28, 1988.

752

754

Herbert R. Whitlock, of Joliet, appellant *pro se.*

Michael M. McFatridge, State's Attorney, of Paris (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On May 22, 1987, following a jury trial in the circuit court of Edgar County, defendant Herbert R. Whitlock was convicted of the murder of Karen Rhoads. He was acquitted of the murder of her husband, Dyke Rhoads. Defendant was subsequently sentenced to a term of natural life imprisonment.

Defendant has appealed. Trial counsel filed an appellant's brief on behalf of defendant. The court then allowed that counsel's motion to withdraw. This court advised defendant by mail of his right to counsel and appointed the State Appellate Defender to represent defendant. On defendant's motion, that appointment was vacated. Defendant was given an opportunity to file a brief on his own behalf and defendant filed several documents which we take as briefs. The State then filed an answer brief, and other documents filed by defendant have been taken as reply briefs. Taking the various documents filed on behalf of defendant together, we conclude he contends on appeal that (1) he was not proved guilty beyond a reasonable doubt; (2) the verdict was a compromise; (3) the trial court erred in denying him a preliminary hearing; (4) the trial court did not comply with the statutory requirements in ruling on defendant's motion for substitution of judge; (5) the trial court erred in denying defendant's motion to discharge the

venire; (6) the State failed to respond in good faith to defendant's motion for a bill of particulars; (7) defendant was denied his right to a fair trial by: (a) the trial court's erroneous admission of certain evidence, and (b) prosecutorial misconduct; (8) the trial court erred in refusing to allow actual tape recordings of defendant's prior consistent statements; (9) the jury was not properly instructed; and (10) defendant's sentence of natural life imprisonment was improper.

On March 10, 1987, the grand jury returned indictments charging defendant Whitlock and codefendant Randy Steidl with the murders of Dyke Rhoads and his wife Karen Rhoads and arson of the Rhoads' residence on July 6, 1986. Prior to trial, the State moved to nol-pros two of the four counts of murder and the arson count.

At trial, Donald Tankerseley, an arson investigator for the Illinois State Fire Marshall, testified that when a fire department arrived at the Rhoads' house in Paris at 4:39 a.m. on July 6, the house had probably been burning for approximately 40 minutes. He said he believed the fire was an "intense, fast fire with a short duration." Sergeant Gary Knight, a crime scene technician with the Illinois State police, testified that the bodies of Karen and Dyke Rhoads had been removed from the house by the fire department, because of a fear the entire house could be burned, including the bodies. He said the crime scene, including the bodies, was damaged by heat, fire, water, and soot, all of which affected his ability to obtain physical evidence. Knight also testified that no latent fingerprints were found anywhere in the house, not even those of the two deceased victims who lived there.

A forensic scientist and a forensic serologist testified that they had examined certain items of physical evidence obtained from the crime scene by Knight and were unable to make any conclusive determinations regarding the identity or type of blood. A "latent print examiner" testified he was unable to find any latent prints on any of the objects which were suitable for comparison purposes. A second forensic scientist testified that he examined head and pubic hairs from both defendants, the decedents, and from the crime scene and concluded that all the human hairs submitted to him were consistent with either Karen or Dyke Rhoads' hair, and no hairs were identified as being consistent with either defendant, Steidl, or any unknown parties.

The primary evidence against the defendant was the testimony of Debra Reinbolt and Darrell Herrington, both of whom testified that they were at the Rhoads' residence on the night the murders were committed.

Reinbolt testified pursuant to a plea agreement whereby she pleaded guilty to concealment of a homicidal death by altering evi-

dence. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1.) She admitted she had had a chemical dependency on alcohol and drugs for her entire adult life and, in July 1986, she used codeine, cocaine, marijuana, and alcohol on a regular basis. Reinbolt testified that, on February 16, 1987, she had voluntarily contacted the police and had given a knife to Detective James Parrish which was purportedly the murder weapon.

Reinbolt testified that defendant knew Dyke Rhoads prior to the murders and that she had accompanied defendant on two prior occasions when he had gone to the Rhoads' house to discuss drug deals. She also testified that defendant had referred to Karen Rhoads as his "dream girl" and he had told Reinbolt that Karen had slapped him in response to an obscene suggestion he had made.

Reinbolt further testified that on the weekend prior to the murders: (1) defendant asked to borrow a knife to "take care of some business"; (2) defendant told her Dyke Rhoads "knew too much" and "had to be taken care of"; (3) she overheard Dyke Rhoads tell defendant he "wanted out," and defendant tell Dyke he could not "just get out" of drug deals in that manner; (4) Dyke later returned with some money and told defendant "I'm out"; and (5) defendant told her he was going to get his "dream girl."

Reinbolt then testified that on the night of the murders: (1) she saw defendant, Steidl, Darrell Herrington, and an unknown man together at a bar in Paris; (2) defendant told her they were going to "have some fun" and "take care of some business"; (3) defendant borrowed her red Bic lighter and did not return it; (4) she then drove by herself to the Rhoads' house and went upstairs, where she observed defendant and Steidl stabbing Dyke Rhoads; and (5) she held Karen Rhoads down, and the two men came over to Karen and cut her throat.

Reinbolt said that when she left the bedroom, there was blood all over, and the mattress was at an angle off the bed. She said she remembered a bed sheet being used to wipe up blood and that there was a shower in the basement. She said that the next morning, defendant gave her the knife, which she cleaned. Reinbolt testified that defendant had told her he "kissed and loved" Karen after she was dead. Reinbolt said that in December of 1986, defendant and Steidl gave her money to keep quiet. She said she used the money to make double car payments and double cable TV payments.

Reinbolt's testimony was discredited in part, because of her testimony she had not worked at her job at the Paris Healthcare Center on the evening of July 5 and had either clocked herself in and left or had asked a friend to clock her in and out of work. The person she

purportedly asked to clock her in and out testified that, although she had clocked Reinbolt in on occasion, she did not work that night and could not have clocked Reinbolt in or out. However, a nurse's log indicated that Reinbolt had been on duty from 4 p.m. to 12 a.m. on July 5.

Reinbolt's testimony was also discredited by the fact that (1) she changed her story to the police several times before trial; (2) in a wiretap conversation with defendant prior to his arrest, she made statements that were not consistent with her having been present at the scene of the murder; (3) she had a record of criminal convictions; (4) she was an addict; and (5) she was an accomplice.

Reinbolt's testimony was corroborated, however, by (1) Lisa Wheeler, who testified she saw Karen Rhoads slapping an individual about a month prior to the murders; (2) evidence that Reinbolt paid double car and cable TV payments in December; (3) testimony of Jeb Ashley that he and Dyke Rhoads had purchased drugs from defendant; (4) a red Bic lighter that was found near the Rhoads' house after the fire; (5) a broken lamp which Reinbolt testified was inside the door of the bedroom and which was found by a fireman when he entered the room; (6) the autopsy, which revealed the stab wounds were consistent with Reinbolt's testimony; (7) the mattress, which firemen testified was found at an angle to the bed; (8) the position of the bodies in the bedroom; (9) the shower, which a fireman testified was in the basement; (10) the lack of fingerprints in the house, suggesting that objects had been wiped off; and (11) the testimony of the pathologist who performed the autopsies on Karen and Dyke Rhoads. He said the knife which Reinbolt had given police "was compatible" with all of the wounds in both bodies.

Darrell Herrington testified at trial he was an alcoholic and had been drinking extensively on July 5, 1986. He said he was with defendant and Steidl that evening and requested that they drive him home. However, they drove to the house of the victims shortly after midnight. Herrington observed defendant and Steidl arguing with Dyke Rhoads on the porch and then entering Rhoads' house. Herrington indicated he believed he "dozed off" for a few minutes and was awakened by the noise of something breaking. He said he entered the house, heard a woman scream and, when he started up the stairs, he was stopped by Steidl. He said Steidl had a bloody knife in his hands, shoved him back outside and threatened to kill him. He said that defendant then came out of the house and left in the car. According to Herrington, while he was gone, Steidl took him back upstairs and threatened to kill him and his family if he told anyone what he

saw. Herrington said he threw a pillow over Karen's face and noticed the mattress was at an angle off the bed. He testified that defendant then returned carrying two jugs of some kind of liquid. Steidl threatened him again, and he ran home. Herrington said he finally went to the police on September 21, 1986, because he was "tired of living with it."

Herrington's testimony was discredited in part by his alcoholism, his admitted intoxication on the night of the murders, and previous convictions for misdemeanor deceptive practices in 1981 and 1982. It was also discredited by his inaccurate description of the car in which he had been riding that night. However, the testimony was corroborated by a fireman's testimony that a pillow was found over Karen's face and that the mattress was not squarely on the bed when they arrived.

Other witnesses for the State included (1) several firemen who testified to the events during the fire and, as indicated, corroborated Reinbolt and Herrington's testimony regarding the murder scene; (2) Jeb Ashley, who corroborated the prior drug transactions between Dyke Rhoads and defendant and testified that both Dyke and Karen were athletic; (3) Carol Arbuckle, defendant's girlfriend during the summer of 1986, who testified that defendant had warned her "something big and bad" was going to happen on the July 4 weekend and later told her that Steidl had been the killer; and (4) Ruth Murphy, a friend of defendant and Steidl, who testified that, in October 1986, defendant was upset and crying about the murders and indicated Karen had been stabbed 26 times and "would have gurgled when she died." Murphy testified that on the night of the murders, she saw Randy Steidl, and he was dressed in long pants.

Although Randy Steidl did not testify, Christy Farris and Nannette Klein testified Steidl was with them and not defendant on the night of the murders. Farris indicated she met Steidl at 9 or 9:30 that night, he left at about 10 or 10:30, to "take care of" some business, and he returned at 12:30 or 1 wearing cutoffs. She said she then stayed in Steidl's apartment until 3 or 3:30 the morning of July 6. She said she was "slightly intoxicated" and fell asleep, but, to her knowledge, Steidl did not leave while she was there. Klein testified, however, she was sitting outside of Steidl's apartment building and saw him leave in his car at about 3 a.m. to "mail an unemployment letter." She said he returned approximately 10 minutes later, and she and Farris went home. Elaine Armstrong, a bartender at Joe's Blue Lounge, testified she saw defendant several times on July 5, and she did not see him with Darrell Herrington on that date. Defendant's

daughter, Brittany Whitlock, testified she was with her father on July 4, 1986, and she went water skiing with her father at noon on July 6. She said she could not remember whether she saw her father on July 5.

Nancy Land then testified she was with defendant from approximately 9:15 p.m. on July 5 until between 11:30 and 12:30, when she dropped him off at his parents' house in Paris. She said he was dressed in jeans and a blue "Thousand Trails" T-shirt. Defendant's father testified defendant arrived at his home between 12 and 1 a.m. on July 6 and remained there watching television, until 4:30 a.m., when the father went to bed. Defendant's mother testified that defendant, who had a house in the country, had been living with his parents in the spring of 1986, because he had lost his driver's license following a DUI conviction and could not drive. She also testified that she did defendant's laundry, had picked up the blue "Thousand Trails" T-shirt at defendant's home two or three weeks prior to his trial, and had found no bloodstains on it.

Defendant called other witnesses to discredit the State's witnesses, and, finally, he testified in his own behalf. Defendant denied knowing Dyke and Karen Rhoads, denied visiting the Rhoads' residence, denied knowing where the Rhoads' residence was, and denied any involvement in the murders. He said Dyke and Karen Rhoads never owed him money, and he never sold drugs on credit. Defendant further stated he did not know Debra Reinbolt in July 1986, did not borrow a lighter from her, and denied telling her he had kissed and loved Karen after she was dead. He also said he was dating and was "very much in love" with Carol Arbuckle in July 1986, and denied telling anyone Karen Rhoads was his "dream girl."

Defendant said he met Darrell Herrington in the early 1980's, but after his first encounter, he had not ever spoken with or confided in Herrington. Defendant testified that he did not see Steidl at all on July 5 or 6, 1986, but acknowledged that after the two of them had been questioned regarding the murders on July 9, 1986, he "felt like [he] was considered a suspect." Defendant said he believed he had been accused by Reinbolt and Herrington, because he had been taken out of a public place (a tavern) for questioning, and because of all the rumors involving him in the crime. Finally, defendant said he did not have a valid driver's license in the summer of 1986 and denied having operated a motor vehicle during that time. The State presented rebuttal witnesses Chris Eldredge, Carol Arbuckle, and deputy John Landrum, all of whom testified they had seen defendant driving his car in the summer months of 1986.

Defendant argues the evidence against him was not sufficient to find him guilty of the murder of Karen Rhoads beyond a reasonable doubt. He maintains the jury's finding of not guilty of the murder of Dyke Rhoads is an indication that the verdict was a compromise and that the jury was not convinced beyond a reasonable doubt as to either murder.

Defendant further notes he had three unimpeached alibi witnesses, his father, Nancy Land, and Christy Farris, all of whom indicated they were with defendant and Steidl at some point between 11:30 p.m. and 1 a.m. on July 5 and 6.

However, none of the alibi witnesses accounted for *all* the time between 11:30 and 1 a.m. Nancy Land said she left defendant at his parents' house "sometime around 11:30 or 12:00." His father testified defendant arrived at his house "between 12:00 and 1:00." Christy Farris indicated she saw Steidl around 10:30 p.m. July 5, and he joined them at another bar between "12:30 [and] 1 o'clock." Finally, Nannette Klein also testified that Steidl joined them "between 12:30 and 1 o'clock."

The State theorized that the murders occurred between 12:15 a.m. and 1 a.m. on July 6, and the fire was started later. None of the alibi witnesses preclude defendant's and Steidl's participation in the murders. Detective James Parrish testified at trial that the distance between (1) the American Legion bar, where Reinbolt said defendant and Steidl had been, and the Rhoads' residence was 1.7 miles and took three minutes to travel by car; (2) the distance between the American Legion bar and Whitlocks' residence was approximately one mile and took approximately two and a quarter minutes to travel by car; (3) the distance between the Rhoads' residence and the Whitlocks' residence was 1.8 miles and took approximately three minutes to travel by car.

In addition, Ruth Murphy testified Steidl had been neatly dressed in long pants when she saw him early in the evening on July 5, but Farris testified that when Steidl returned to the bar between 12:30 and 1 a.m., he was wearing cutoffs. The State argues that gave Steidl time to commit the murders and then go home and change clothes. The State further theorized that, rather than mailing an unemployment letter at 3 a.m. on Sunday morning as he had told Nannette Klein he was doing, he might have used the time to drive by the Rhoads' house to see if it were burning. After Klein and Farris left, the State argued, he could have returned to set the second fire.

Nancy Land's alibi testimony was also not conclusive. She said she dropped defendant at his parents' house between 11:30 and 12:30

a.m. The State argues if it were closer to 11:30, defendant could have walked the five or six blocks to the American Legion bar, met with Steidl, committed the murders, and still have returned to his parents' home before 1 a.m. Moreover, Carol Arbuckle testified that defendant told her, "Don't you know, Randy killed those people," and Ruth Murphy testified that defendant told her if he talked to someone "They'll get me, too."

Defendant maintains the most damaging evidence against him came from two admitted alcoholics, both of whom were intoxicated to some extent at the time of the murders, and their testimony was so incredible and improbable that it must have raised a reasonable doubt.

■ Defendant cites *People v. Pellegrino* (1964), 30 Ill. 2d 331, 196 N.E.2d 670, where the supreme court reversed a conviction of murder. There, the conviction was based on the testimony of (1) the victim of a concurrent battery by that defendant, who was "stunned, bleeding and crying" at the time the deceased was beaten to death and who changed her story as to who did the beating; and (2) a woman who was in the fourth week of a seven-week period of drunkenness at the time of the event, could not walk five feet without holding the wall, and did not recognize the person helping the victim from three feet away. The court noted there was nothing in the record to indicate why the battery victim changed her story or on which occasion she was telling the truth. The court found that although the trier of fact's finding on the credibility of witnesses was entitled to great weight, it is not conclusive and concluded the evidence was so unsatisfactory as to raise a reasonable doubt of defendant's guilt.

■ In *People v. Norman* (1963), 28 Ill. 2d 77, 190 N.E.2d 819, the court noted, in affirming a conviction for unlawful sale of narcotics, that "[a]lthough the testimony of a narcotics addict must be scrutinized with caution, his testimony may be sufficient to sustain a conviction if credible under the surrounding circumstances." *Norman*, 28 Ill. 2d at 82, 190 N.E.2d at 822.

■ It is the jury's function to determine the credibility of the witnesses, the weight to be given their testimony, and inferences to be drawn therefrom. The jury's determination of guilt should not be disturbed on review where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

██ Here, Reinbolt and Herrington corroborated each other's testimony, although neither apparently knew at the time that the other was at the scene, and their testimony was corroborated by a number of other, reliable, witnesses. In addition, here, unlike *Pellegrino*, Reinbolt offered a plausible explanation for changing her story. She was afraid of defendant and Steidl. In addition, prior to entering into the plea agreement, she could have been charged as an accomplice.

Since the testimony of both key prosecution witnesses was corroborated in most significant details by other evidence, the jury could have found the witnesses were credible and worthy of belief and could have found defendant guilty beyond a reasonable doubt.

██ We next confront defendant's assertion that the verdict finding defendant guilty of the murder of Karen Rhoads and not guilty of the murder of Dyke Rhoads was logically inconsistent and that the conviction of the former murder must be set aside. Since *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, and prior to *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030, the case law in this State indicated that in criminal cases, verdicts which were logically inconsistent could stand, as long as they were legally consistent. The effect of *Spears* is, at least, somewhat uncertain. However, even assuming *arguendo* that *Spears* requires the setting aside of verdicts of conviction which are logically inconsistent with verdicts of acquittal returned in the same case, we have no problem with the verdict here.

Defendant emphasizes the strength of Debra Reinbolt's testimony of his participation in the murder of Dyke Rhoads. He points out that when asked "[W]ho did you see stab Dyke Rhoads?" Debra Reinbolt responded: "Herbie [Whitlock] and Randy [Steidl]." Defendant contrasts this with Reinbolt's only words tying defendant directly to the murder of Karen Rhoads that "they grabbed ahold of her and cut her." However, Herrington testified that when he entered the house, he heard a woman screaming and Steidl came downstairs immediately while defendant came down later and indicated matters had been "taken care of." Further, Reinbolt and Herrington both indicated Karen's upper body was unclothed, but the first fireman on the scene indicated she was completely naked. Her shorts and underpants were found rolled together at the foot of the bed. This factor would be consistent with Reinbolt's testimony that defendant had "loved and kissed" Karen after she was dead.

Thus, the jury could logically have concluded that, because of greater corroboration, the evidence that defendant killed Karen Rhoads was somewhat stronger than the evidence that he killed Dyke Rhoads. The jury could then have concluded that the evidence in re-

gard to the murder of Karen Rhoads met the reasonable doubt standard, but that in regard to the murder of Dyke Rhoads did not. Accordingly, we are satisfied the acquittal of defendant as to the Dyke Rhoads murder does not impair the validity of defendant's conviction of the Karen Rhoads murder.

■ Defendant next contends the trial court erred in denying him a preliminary hearing. The record shows defendant was taken into custody on February 19, 1987, and was charged by information with the murders of Dyke and Karen Rhoads. On February 20, 1987, defendant requested an immediate preliminary hearing and, after a continuance granted to the State, a hearing was scheduled for March 17, 1987, over defendant's objections. A grand jury was then called and, on March 10, 1987, which was within 30 days of defendant's arrest, the grand jury returned indictments charging defendant with the murders of Dyke and Karen Rhoads. On the court's own motion, the preliminary hearing set for March 17 was vacated, over defendant's objection.

Section 109—3.1(b) of the Code of Criminal Procedure of 1963 (Code) provides:

> "Every person in custody in this State for the alleged commission of a felony shall receive *either* a preliminary examination as provided in Section 109—3 or an indictment by Grand Jury as provided in Section 111—2, within 30 days from the date he or she was taken into custody." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 38, par. 109—3.1(b).)

In *People v. Garza* (1981), 92 Ill. App. 3d 723, 732, 415 N.E.2d 1328, 1336, the court noted that "[t]he weight of judicial authority has determined that the grand jury and the preliminary hearing are constitutional substitutes that can be interchanged without offending equal protection guarantees."

■ Since defendant was charged by a grand jury within 30 days of his arrest, and since the previous informations were dismissed, the trial court properly vacated the date for the preliminary hearing.

Defendant also maintains the grand jury indictment was improper, because it was obtained "by the use of known lies and perjured testimony." All of the grand jury witnesses who testified against defendant also testified against him at his trial. The evidence presented to the grand jury was substantially similar to that presented at defendant's trial.

■ The Supreme Court has noted, in considering the broad powers of the grand jury:

> "The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the charac-

ter of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." (*United States v. Calandra* (1974), 414 U.S. 338, 344-45, 38 L. Ed. 2d 561, 569, 94 S. Ct. 613, 618.)

Moreover, in *United States v. Dionisio* (1973), 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764, the court noted that because the grand jury's task is to inquire into the existence of possible criminal conduct in order to return only well-founded indictments, its investigative powers are necessarily broad. In addition, the court said "[t]he jurors may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge." *Dionisio*, 410 U.S. at 15, 35 L. Ed. 2d at 80, 93 S. Ct. at 772.

■ Because of the great leeway given to the grand jury to determine whether to return an indictment, as well as the safeguards afforded defendant in being able to cross-examine those same witnesses against him when they testified at trial, we find no error occurred in the grand jury proceedings. Defendant's unspecified complaint that "lies" and "perjured testimony" were used to obtain his indictment, even if true, resulted in no substantial prejudice to defendant.

■ The defendant next argues the trial court erred in failing to comply with the statutory requirements of section 114—5(a) of the Code of Criminal Procedure of 1963 (Code) in ruling on his motion for substitution of judge. That section provides:

"(a) Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." Ill. Rev. Stat. 1985, ch. 38, par. 114—5(a).

On March 11, 1987, defendant filed a motion for substitution of Judge Pearman. Judge Pearman stated on that date that he would allow the defendant's motion but that he would wait until after the 10-day period had expired before naming a new judge. On March 23, 1987, Chief Judge Pearman assigned the case to Judge James Robinson.

The State maintains that since defendant was charged with a Class X felony, he had only the 10-day period following his written motion to name two judges as prejudiced, and the trial judge properly waited until the expiration of the 10-day period to see if defendant would name a second judge. We agree.

In *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165, *cert. denied* (1988), 484 U.S. 1072, 98 L. Ed. 2d 1006, 108 S. Ct. 1043, the defendant was granted his motion for automatic substitution of judge. Four months later, he argued he should have been granted a second substitution for a different judge. The appellate court rejected the second attempt to substitute a judge, holding that the defendant, charged with murder, had only one opportunity to substitute two judges within 10 days after his cause is placed before the trial call of a judge. *Partee*, 157 Ill. App. 3d at 246, 511 N.E.2d at 1175.

Here, as in *Partee*, the defendant did not include the second judge in his motion to substitute, and he did not file a second motion within the 10-day period. The trial judge properly complied with the statute in waiting until the expiration of the 10-day period before assigning another judge to allow defendant to file a second motion.

Defendant's sixth contention is that the trial court erred in denying defendant's motion to discharge the venire. Defendant argues the jury panel was improperly selected by computer and did not comply with the statute which provides that the list of jurors "shall be made by choosing every tenth name *** from the latest voter registration or drivers license holders lists of all the towns or precincts in the county." Ill. Rev. Stat. 1987, ch. 78, par. 1.

Defendant notes the jury panel here consisted of a number of potential jurors with the same name and at least two groups of two people with the same address. The court recognized the jury had not been randomly selected and advised counsel that it would allow challenges for cause for persons with the same names to be certain there were no relatives on the jury and to exclude people who lived near each other. Defendant expressed no objections to that procedure. The court, however, overruled defendant's challenge to the venire.

Defendant argues the trial court improperly refused to discharge the jury panel in violation of section 114—3(d) of the Code. That section provides:

"(d) If the court finds that the jury panel was improperly selected or drawn the court shall order the jury panel discharged and the selection or drawing of a new panel in the manner provided by law." Ill. Rev. Stat. 1985, ch. 38, par. 114—3(d). ·

Defendant cites *People v. Mack* (1937), 367 Ill. 481, 11 N.E.2d

965, in support of his argument that a challenge to an array must be sustained even though no prejudice is shown. In that case, the alleged error arose during grand jury selection when the county sheriff, at the court's direction, selected eight persons to complete the regular panel, since that number was absent on the day designated for the grand jury to sit. A conflict in the application of the statute arose, and the court concluded that the general statute did not control over the Jury Commissioners Act.

The *Mack* case was distinguished in *People v. Jefferies* (1972), 6 Ill. App. 3d 648, 285 N.E.2d 592, where a defendant alleged that fatal prejudice resulted where the State's Attorney was present and participated in the selection of the grand jury. The court indicated that *Mack* was "an exceptional instance of irreconcilable conflict between two separate and distinct statutes in effect at the same time." (*Mack*, 6 Ill. App. 3d at 653, 285 N.E.2d at 596.) The court concluded *Mack* was not applicable and that the trial court correctly denied defendant's motion to quash the indictment absent a showing of prejudice. *Mack*, 6 Ill. App. 3d at 654, 285 N.E.2d at 596.

In *People v. Hopkins* (1953), 415 Ill. 11, 111 N.E.2d 587, defendant, relying on *Mack*, argued on appeal that the trial court improperly denied his motion to quash his grand jury indictment on grounds the jurors were not selected according to statute. The court concluded that, in the absence of prejudice to substantial rights of the defendant, where there was an attempt to comply with the statutory requirements, any irregularities would not vitiate the action of the grand jury. *Hopkins*, 415 Ill. at 16, 111 N.E.2d at 589.

In *People v. Beacham* (1980), 87 Ill. App. 3d 457, 410 N.E.2d 87, the court also concluded that, to sustain a challenge to a jury array, a defendant must show substantial prejudice. A similar conclusion was reached in *People v. Reed* (1982), 108 Ill. App. 3d 984, 439 N.E.2d 1277, where the court found the jury selection by computer, where no jury commissioners were present, was error, but because it did not contribute to the finding of defendant's guilt, it was harmless beyond a reasonable doubt. *Reed*, 108 Ill. App. 3d at 991-92, 439 N.E.2d at 1282-83.

Here, although the irregularity was apparent at the outset, there was no indication the irregularity resulted from human input in the selection process. Rather, the irregularity was a result of computer error. Randomness is defined as something done without definite aim or purpose (Webster's Ninth New Collegiate Dictionary 974 (1986)). The jury selection was in substantial compliance with the statute.

Moreover, cases decided after the enactment of section 114—3 of

the Code clearly indicate prejudice or substantial injustice must be shown to support a defendant's motion to discharge the venire. Here, the court allowed the parties to discharge for cause any person with the same name or a relationship to another juror, as well as neighbors of those already selected. Thus, those selected to try the case constituted a better cross-section than did the original array. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4.) In addition, defendant has not alleged he was prejudiced or that he suffered substantial injustice from the selection of the jury. The trial court properly denied defendant's motion to discharge the panel.

■■■ Defendant also argues he should have been allowed 20 peremptory challenges as provided in section 115—4 of the Code rather than 14 as allowed by Supreme Court Rule 434(d) (107 Ill. 2d R. 434(d)). Defendant notes he exhausted his 14 peremptory challenges.

The trial court reasoned that, under the separation of powers, it was within the authority of the supreme court to determine matters of procedure, that the number of challenges was procedural, and that the supreme court rule, therefore, controlled over the conflicting statute.

In *People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602, the court found that a statute allowing opposing counsel the right to conduct *voir dire* examination of prospective jurors, which conflicted with a supreme court rule providing that the court conduct *voir dire*, was a legislative infringement on the powers of the judiciary and was thus void. Here, the trial court was correct in determining that the number of challenges was a procedural matter, and the statute was thus an infringement on the court's power.

Defendant's next contention is that he was prejudiced by the State's failure to reply in good faith to defendant's motion for a bill of particulars and to the court's order of April 30 that the State designate probable witnesses from a list of 130 possible witnesses. In addition, defendant argues the State abused the discovery process and intentionally withheld evidence from defendant.

The motion for a bill of particulars included a request for the exact time and date of the occurrence. The State's response was that the crime occurred at "approximately midnight to 4:30 a.m. on July 6, 1986." The evidence at trial indicated the actual time of the crime was between midnight and 1 a.m. Defendant argues that since he gave notice of his alibi defense, and accurate times were critical to proving he had an alibi, the State had an obligation to provide him with the information available. He claims that by allowing the State to answer the motion for bill of particulars in general terms encom-

passing a 4½-hour time span, when the State knew the evidence would show the occurrence happened within a one-hour period, was a violation of due process.

The function of a bill of particulars is to permit the defendant to prepare his defense and to limit the evidence which may be introduced by the prosecution. (*People v. Walton* (1969), 118 Ill. App. 2d 324, 333, 254 N.E.2d 190, 194.) Here, there was evidence the decedents were seen at approximately 11:30 p.m. on July 5, and the firemen arrived at decedents' house at 4:39 a.m. on July 6. Defendant was charged with both the murders of the decedents and with arson of their residence. The bill of particulars accurately apprised defendant of the charges against him at the time the motion was filed. Considering the length of time between the time when the witnesses said the murders took place and the time the fire was discovered, the general answer to the bill of particulars was not improper.

In addition, defendant did not object, nor did he request a more specific bill of particulars, at the time the State gave its answer. Thus, any error is deemed waived. *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.

Defendant next contends the court erred in denying his motion for a continuance in response to the State's filing of a list of probable witnesses. The record shows the State furnished defendant a list of 130 potential witnesses on March 31, 1987, in compliance with section 114—9 of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 114—9). On April 29, 1987, when defendant objected to the difficulty of interviewing over 100 witnesses, the State responded that it had given statements or memoranda on every witness. The court then ordered the State to compile a list of probable witnesses, which it did. Then, on May 11, 1987, the State provided a new list containing additional possible witnesses from the original witness list. Defendant requested a continuance because the "new" witnesses were unexpected, were going to testify to admissions defendant allegedly made, and "changed the complexion of the defense." The court denied the motion.

Section 114—9 requires the State to furnish the defense with a list of prosecution witnesses to prevent surprise and prejudice and to give the defendant an opportunity to combat false testimony. (*People v. Raby* (1968), 40 Ill. 2d 392, 401, 240 N.E.2d 595, 601.) The supreme court has repeatedly held that it is within the trial court's discretion to allow unlisted witnesses to testify, and in the absence of a showing of surprise or prejudice, that discretion will not be reviewed. (*Raby*, 40 Ill. 2d at 401, 240 N.E.2d at 601.) Here, the additional list of possible witnesses (all shown on the original list of 130) was fur-

nished two weeks before trial, and at that time, the State also furnished defendant with statements from all those witnesses. The defendant's alibi testimony was unchanged from his notice of alibi. There was no showing of surprise or prejudice, and the court properly denied defendant's motion for a continuance.

Defendant also complains that the State withheld evidence to his prejudice. In support of his post-trial motion, defendant filed three affidavits dated after the date of trial. Two affiants purported to have talked to Herrington and one to have talked to Reinbolt. All alleged to have received information from Herrington or Reinbolt that was contrary to or in addition to the testimony given by that person at trial. The affiant who purported to have talked to Reinbolt said Reinbolt indicated more people were involved in the murders and that she knew more than what she had testified to at trial. The information from Herrington concerned the possible presence of another automobile at the scene of the fire. The affiants who purported to have talked to Herrington also stated Herrington told them the prosecutor had told him not to mention at trial the information Herrington gave to the officials. The State filed counteraffidavits from Herrington, Reinbolt, and the prosecutor denying these allegations. In denying the post-trial motion, the trial court concluded the matters contained in the affidavits did not involve new evidence of sufficient weight to require granting of a new trial. The trial court did not abuse its discretion. *People v. Holtzman* (1953), 1 Ill. 2d 562, 566-67, 116 N.E.2d 338, 341.

Defendant's next contention concerns the admission and refusal of evidence and possible misconduct by the court and the prosecutor.

Defendant's first contention in this issue is that (1) the testimony of Ruth Murphy regarding a conversation he had with her in October 1986, in which he (a) stated the number of times Karen was stabbed, (b) asked whether she would have made a gurgling sound when she died, and (c) remained silent when she questioned him about the murder; and (2) the testimony of Carol Arbuckle regarding a conversation wherein defendant told her Steidl had killed the Rhoads, were highly prejudicial, a repetition of street gossip, and likely to give the jury an erroneous impression. Defendant maintains that none of these statements made by him constituted an admission, because the statements did not tend to prove him guilty of the offenses charged.

The supreme court has said that "[a]n admission is a statement made by an accused of a fact pertinent to the issue and tending, in connection with proof of other facts, to prove his guilt." (*People v. Richardson* (1961), 21 Ill. 2d 435, 439, 172 N.E.2d 801, 803.) Al-

though the statement may lead to an inference of guilt, a finding of guilt does not necessarily follow. Here, although defendant's statements to Murphy and Arbuckle were more than just prior inconsistent statements and, although they did not necessarily indicate he had actually committed the crime, they supported an inference of guilt. Moreover, defendant's silence when Murphy confronted him with questions about the murder could be a tacit admission of guilt. (*People v. Armstrong* (1983), 111 Ill. App. 3d 471, 478, 444 N.E.2d 276, 281.) Finally, defendant's statement to Arbuckle that Steidl had killed the Rhoads was an admission similar to that in *People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369, where the defendant's statement that a codefendant had shot the victim was an indication of his presence at the time of the murder. Here, defendant's statements were not a confession that he committed the crime, but they indicated knowledge of the facts of the crime which were admissible to establish his guilt.

Defendant's second contention in this issue is that the testimony of Jeb Ashley regarding prior drug sales between defendant and Dyke Rhoads was irrelevant and extremely prejudicial. The State argues, however, that Ashley's testimony was important to establish that the motive for the killings was a "bad drug deal." They note the theory is supported by Reinbolt's testimony that she had overheard defendant tell Dyke he could not "just get out" of a drug deal, and testimony that defendant had said to Lee Bensyl, only three days after the murders, that he had heard the Rhoads were killed because of a drug deal.

■■ Although evidence of other crimes is generally not admissible to show defendant's propensity to commit the crime charged (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489), proof of the presence of a motive which would lead the defendant to commit the offense charged is always relevant and may be admitted. *People v. Gougas* (1951), 410 Ill. 235, 238, 102 N.E.2d 152, 154; *People v. El* (1980), 83 Ill. App. 3d 31, 403 N.E.2d 547.

■■ Ashley's testimony was also admitted to establish that a drug trafficking conspiracy may have been involved, with the murders of Dyke and Karen Rhoads as the culmination of the conspiracy. This court indicated in *People v. White* (1984), 122 Ill. App. 3d 24, 460 N.E.2d 802, that an uncharged conspiracy may exist as the predicate for admissions and statements of coconspirators. Here, the trial court found that a *prima facie* case of conspiracy of drug trafficking had been laid and that the evidence showed the motive for the killings may have been a "bad drug deal." The court concluded the State was,

therefore, entitled to produce evidence showing the defendant was engaged in narcotics traffic.

■ Defendant's third contention in this issue is that the court erred in allowing the introduction of evidence of his prior convictions for unlawful possession of marijuana and cocaine as impeachment. The court, in ruling on a motion *in limine* concerning the evidence and other narcotics, balanced the prejudicial effect against the probative value of the information as articulated in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, and ruled that the State could introduce only the dates and fact of the felony convictions. However, the defendant chose to inform the jury of the nature of the offenses to avoid "wild speculation." We find no error to have occurred in the court's admission of the fact of the convictions.

■ Defendant's fourth contention in this issue is that the court erred in allowing into evidence a knife which was allegedly used in the commission of the murders. Defendant argued in his motion *in limine* that the State should be precluded from admitting into evidence the alleged murder weapon until the State had shown the chain of custody and that the knife was in fact the murder weapon. Defendant notes that Reinbolt did not present the knife to the police until over six months after the murders had been committed. In addition, she initially told the police the knife belonged to defendant, and he gave it to her after the murders. However, at trial, she testified the knife belonged to her husband, she had loaned the knife to defendant prior to the murders, she saw him use it to commit the murder and he returned it to her after the murders.

Dr. John Murphy, the pathologist who performed the autopsies of Dyke and Karen Rhoads, testified at trial that the knife admitted into evidence was "compatible" with all of the wounds found on both bodies. He indicated that although the knife was not necessarily the murder weapon, the knife blade was not shorter than the deepest knife wound. However, he said he could not state with scientific certainty that the knife had caused the deaths.

Defendant maintains the testimony of the pathologist was too uncertain, and, because Reinbolt's testimony was inconsistent with her previous story to the police, neither person's testimony should have formed the basis for the admission of the knife into evidence as the alleged murder weapon. We disagree. Reinbolt positively identified the knife as the weapon used. Any inconsistency between this testimony and her previous statements goes only to the weight. The testimony of John Murphy had corroborative relevance. The court properly admitted the evidence.

■ Defendant's next contention in regard to the admission of evidence is that the court erred in allowing the State to introduce photographs showing a reconstruction of the scene in the bedroom as it purportedly appeared before the victims' bodies or any other items were removed. One of the first firemen who arrived at the scene testified the furniture had been rearranged three days after the fire and the picture taken then. He testified the pictures showed the scene as it existed when he came in on the day of the fire. Thus, the photographs were posed. Such photographs are regarded with disfavor in light of the propensity of triers of fact to be misled into conferring upon them disproportionate emphasis. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §401.8, at 126-27 (4th ed. 1984).

In *Ellis v. Flannigan* (1912), 253 Ill. 397, 97 N.E. 696, the propriety of a circuit court order admitting a will to probate was in issue. The opponents of the will had been permitted to introduce a photograph of the room where the will was executed. The photograph showed the furniture rearranged as it was at the time of the execution of the will, according to the testimony of a person purportedly familiar with the arrangement of the furniture at the time. The supreme court stated that the photograph should not have been admitted, particularly in view of the fact that a person who was stated to have aided in rearranging the furniture would have inherited substantially all of the decedent's property in case of an intestacy. However, the supreme court upheld the probate of the will. The court apparently spoke to the admissibility of the photograph, because it was the only evidence which refuted the testimony of the attesting witnesses.

■ The photographs of the reconstructed scene should not have been admitted here. However, the persons rearranging the furniture here were firemen and were not shown to have any substantial bias. The exact position of the furniture was not crucial to the case. The error was not reversible.

Defendant's next contention in this issue is that the trial court erred in refusing to conduct a competency hearing for Reinbolt. Defendant argues that Reinbolt's admitted addiction to narcotics and her use of various narcotics and intoxicants at or around the time of the murders raises a question as to her competence to testify. The trial court denied defendant's request for a competency hearing based on the court's observation of Reinbolt during admonishment conferences. The court stated her ability to recall was a question for the jury and would be covered by cross-examination.

■ The test of the competency of a witness is one of intelligence and understanding and, in the absence of a statute, a witness

who is mentally impaired is not incompetent if he understands the nature of an oath and has sufficient mental power to give a correct account of what he has seen and heard. (*People v. Dixon* (1961), 22 Ill. 2d 513, 515, 177 N.E.2d 224, 225; *People v. Blair* (1986), 146 Ill. App. 3d 186, 496 N.E.2d 1066.) In *Dixon*, the witness was a narcotics addict, and the court found that her habitual use of drugs did not render her incompetent to testify as long as she had the capacity to observe, recollect and communicate. (*Dixon*, 22 Ill. 2d at 515-16, 177 N.E.2d at 225.) If the witness can meet those qualifications, any mental deficiency is considered only insofar as it affects the credit to be given his testimony. Here, the jury was well informed of the witness' addiction, and the court did not abuse its discretion by denying a hearing to determine Reinbolt's competency.

■■■ The next argument in this issue is that the trial court erred in allowing fireman Phil McConchie, Dyke Rhoads' cousin, to testify. Defendant argues he offered no relevant evidence and only testified to elicit a sympathetic response from the jury. McConchie was the first fireman on the scene and testified that a neighbor had approached him with the information that people were inside. In addition, he testified that he had just broken some windows to let out some of the intense heat when Captain Wallace indicated he had found a body. McConchie apparently "choked up" for a moment on the witness stand, but no recess was taken. McConchie estimated the fire had been burning 20 minutes when they arrived.

McConchie's testimony was important in describing the intensity of the fire when they first arrived, the warning that there were people inside and his estimation of how long the fire had been burning. His apparent brief, emotional lapse was not excessive and did not unduly prejudice defendant.

■■■ Defendant's next contention is that the trial court erred in restricting his cross-examination of Darrell Herrington regarding his alcoholism and criminal record. Defendant was permitted to show Herrington had been convicted of misdemeanor deceptive practices for writing fraudulent checks in 1981 and 1982, and to show Herrington had five convictions for driving under the influence of alcohol from 1979 to 1987. However, the court denied defendant's request to bring out Herrington's convictions date by date. Defendant argued that he should be permitted to do so, because he wanted to develop evidence to show the extent of Herrington's alcohol addiction and to establish the period of time he had been an alcoholic.

Herrington testified on direct examination that he was an alcoholic and had spent the day of the murders drinking. He further testi-

fied that the State's Attorney had made no promises to him regarding any outstanding checks that had been returned for insufficient funds.

Since the facts of Herrington's alcoholism and prior criminal record were before the jury through his own testimony as well as that of other witnesses, there was no error in not allowing more specific details.

■■■ Defendant's next argument in this issue is that he was prejudiced by the actions of Dyke Rhoads' brother Tony. Defendant stated in an affidavit that, as Tony was leaving the courtroom after testifying, he approached the table where defendant was sitting and mouthed the words "f--- you." He then left the courtroom, slamming the door and making a commotion. Defendant maintains Tony Rhoads' actions deprived him of a fair trial.

This alleged action was not shown by the record. Moreover, as the State's Attorney pointed out at the hearing on defendant's motion for a new trial, if Tony Rhoads had said anything silently to defendant, he would have to have been facing defendant and his back would have been to the jury. In that case, the jury would not have seen what might have been silently said. There was no substantial prejudice shown by the action of decedent's brother. The trial court was in a better position to evaluate whether he was giving vent to his natural feelings or whether he was attempting to influence the jury. *People v. Hood* (1974), 59 Ill. 2d 315, 325, 319 N.E.2d 802, 808.

■■■ The next argument in this issue is that defendant was denied a fair trial by improper cross-examination and rebuttal evidence. Defendant argues that the trial court improperly allowed rebuttal evidence of defendant's driving while his license was suspended.

Defendant's father testified his son moved from his house in the country to his parents' house in town, because he had lost his driver's license. The father said he was positive defendant did not drive without a license. Defendant's mother testified that defendant came to live with them after he lost his license since he had no way to get around. She said his Triumph automobile was not running in July 1986 and his Datsun 280ZX was impounded. She said, as far as she knew, defendant did not drive a car during the summer of 1986. Defendant had testified he did not have a driver's license in the summer of 1986, because he had previously refused to take a breath test. He denied operating any car during the summer of 1986 and specifically denied driving his Datsun near the Stanley Clark gas station on July 31, 1986, or driving by the house of Carol Arbuckle at night.

Defendant objected to any rebuttal evidence being presented by the State and objected that he had not been given a list of rebuttal

witnesses in advance. However, the State need not inform defendant of its intent to call a rebuttal witness until the intent to call the rebuttal witness is formed, because a prosecutor cannot know of the need for rebuttal until the defense testimony is heard. *People v. Galindo* (1981), 95 Ill. App. 3d 927, 932, 420 N.E.2d 773, 777.

Here, the court indicated that the State could not present evidence showing defendant committed a driving violation. However, it found the "mobility" of defendant was an issue in the case, because of questions which arose as to whether defendant had access to or had driven an automobile. Thus, rebuttal evidence was proper for impeachment purposes. The testimony of Chris Eldridge, Carol Arbuckle, Deputy John Landrum, and Darrell Herrington that they had seen defendant drive an automobile during the summer of 1986 was evidence that defendant had independent mobility and did not rely exclusively on others for transportation. The admission of rebuttal evidence is within the discretion of the trial court and will not be set aside absent an abuse of discretion. *People v. Waller* (1977), 67 Ill. 2d 381, 387, 367 N.E.2d 1283, 1286.

Defendant's next contention in this issue is that his confrontation rights were violated by the court's order that defendant not be present during its *in camera* interview of Debra Reinbolt. The court admonished her, prior to her testimony, of her obligation to tell the truth regardless of any obligation she felt she was assuming under the plea agreement.

Defendant's confrontation rights were not violated by his exclusion from the *in camera* proceedings. In *Kentucky v. Stincer* (1987), 482 U.S. 730, 739, 96 L. Ed. 2d 631, 643, 107 S. Ct. 2658, 2664, the Court indicated that the purpose of a confrontation right is to promote reliability in criminal trials by insuring a defendant an opportunity for cross-examination. Here, neither defendant's confrontation nor due process rights were violated by the *in camera* admonishments on the guilty plea. Defendant's attorney was present at the hearing and had the opportunity to repeat any questions he thought important once Reinbolt took the witness stand.

The final argument in this issue is that defendant was denied a fair trial because of prosecutorial misconduct. Defendant argues (1) the State's Attorney repeatedly publicized the case in the media, stating the motive appeared to be drug-related; (2) the plea agreement and admonishment by the judge of Reinbolt was "inappropriately" placed before the jury through the State's Attorney's questioning of Reinbolt; (3) in the State's opening statement, the State's Attorney made reference to a "drug deal" as the motive for the murders; and

(4) during closing argument, the State's Attorney misstated the evidence.

■■■ As to the first argument, we note that defendant's motion for a change of venue was granted, and, at his suggestion, the trial was moved to Vermilion County. *Voir dire* examination of the panel showed little familiarity with the facts of the case. Defendant has not shown any prejudice by any pretrial publicity regarding the motive for the murders.

■■■ Defendant argues the State, on direct examination, improperly questioned Reinbolt regarding her plea agreement and her promise to testify truthfully. Defendant did not object. We see no error in the questioning and any error was waived by failure to object. Defendant invited further comment on cross-examination when he pressed the issue and asked her whether the State would charge her with murder if her trial testimony differed from her original statement. On redirect, the State questioned Reinbolt regarding the court's admonishment that she was to tell the truth regardless of the terms of the plea agreement. Again, defendant did not object.

It was not improper for the State to present evidence that the witness was admonished to tell the truth in light of the defendant's attack on her credibility. The State's conduct did not deprive defendant of a fair trial.

■■■ The third contention in this issue is that during his opening statement, the State's Attorney improperly commented on the possibility of a drug-related motive for the murders. Defendant did not object. Moreover, he has shown no prejudice by the reference to such a motive, where the testimony presented at trial also raised the possibility. Defendant was not denied a fair trial by the State's Attorney's remarks.

In the final argument of this issue, defendant maintains the State's Attorney misstated the evidence given by (1) defendant's father concerning his son's alibi; (2) Beverly Johnson, regarding whether she had clocked Reinbolt in and out of work on July 5; (3) Lisa Wheeler regarding the person Karen Rhoads slapped about a month prior to the murders; and (4) Carol Arbuckle. We note defendant made no objections to any of the State's arguments. The failure to object to an improper argument by the prosecutor normally waives the right to raise the point on review. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297.) However, here, as in *Myers*, a review of the argument is necessary to ascertain if it was so seriously prejudicial as to deprive defendant of a fair trial.

■■■ Defendant's father had testified that on the evening of July

5 and the morning of July 6, 1986, defendant had arrived at his home, and after the two talked and watched the "Goodwill Games" on television, the father went to bed at 4:30 a.m. while defendant slept on a sofa. In rebuttal, the State presented testimony that the "Goodwill Games" ended at 3 a.m. that morning. In surrebuttal, the father testified he did not intend to say the games were over at 4:30 a.m., but rather, that he did not go to bed until then. During closing argument, the prosecutor said the father "changed his story in front of [the jury's] eyes," regarding the time the games ended, and said it was "incredible" that he stayed up until 4:30 a.m., the exact time indicated in the indictment that the crimes were committed.

This was not a misstatement of the father's testimony. Rather, it was a reasonable inference that could be drawn from his testimony.

■■ Defendant's complaint regarding the State's reference to Beverly Johnson is also without merit. She testified that, although she had not worked on July 5, and did not clock Reinbolt in and out on that date, she had done so on some other day that summer. The prosecutor indicated in closing argument that Reinbolt's testimony that Johnson may have clocked her in on the evening before the murders was thus a truthful statement, but it was "perhaps a misdate." He further relied on Johnson's testimony to show, as Reinbolt had indicated, that it was possible to clock yourself in and out and not get caught. The argument, again, is not a misstatement of the evidence. Reinbolt said Johnson may have clocked her in and out or she may have done it herself. There was no error in the prosecutor's statement.

■■ Defendant also complains that the State's Attorney referred to the testimony of Lisa Wheeler as corroborating the testimony of Reinbolt concerning Karen Rhoads' slapping defendant. However, Wheeler's testimony did verify that Karen Rhoads had slapped a man about a month before the murders, at about the same time Reinbolt indicated she saw a red mark on defendant's face. There was no misstatement in this argument.

■■ Finally, we note that there was no impropriety in the State's argument that defendant did not cross-examine Carol Arbuckle because she was telling the truth. This, too, was a reasonable inference which could be drawn.

■■ Defendant's next issue concerns his attempt at trial to have introduced into evidence audio tape recordings obtained by the State of conversations he had with Herrington and Reinbolt. The taped conversations were obtained with court approval. The purpose for defendant's request was to show he made statements consistent with

his testimony at trial, wherein he denied involvement in the murders. Upon the State's objection, the court refused to allow the tapes to be played but permitted the substance of one tape to be read to the jury. In addition, the court told the jury, that with regard to defendant's conversation with Herrington, defendant also denied committing the crime.

Since defendant had not been impeached by inconsistent statements and no contention had been made that his testimony was a recent fabrication, the court was not obliged to submit any portion of the tapes to the jury. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.14, at 397-98 (4th ed. 1984).) Even if defendant was entitled to have the information, there was no prejudice, because the substance was read to the jury.

■ Defendant next argues the trial court erred in excluding proffered testimony of a psychologist on the reliability of an alcoholic or drug addict witness. While this testimony might have been relevant, the issue was collateral and was a matter of discretion for the trial court. The trial judge's decision on the admissibility of expert testimony is to be given deference, and that decision will not be overturned absent an abuse of discretion.

Defendant argues the jury was not properly instructed. The defendant objected to the State's instructions (1) regarding motive, (2) regarding accountability, and (3) the number of verdict forms to be given. He also objected to the court's refusal to instruct the jury on the reliability of testimony of drug addicts and alcoholics.

■ The first objected-to instruction related to the testimony of an offense other than that charged in the indictment. The instruction to the jury was that the evidence was received solely on the issue of defendant's "intent, motive, design and/or knowledge" and was to be used only for that limited purpose. Defendant's refused version of this instruction indicated the evidence was received solely on the issue of his "presence."

Evidence was received from Reinbolt and Ashley that defendant knew Dyke Rhoads and that the two men had been involved in drug transactions. There was no error in giving the instruction as presented by the State where the evidence supported its limited use. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

■ The complained-of instruction on accountability indicated that defendant was responsible for the conduct of another either before or during the commission of the offense. Defendant argues accountability was not an issue, since he was charged with committing the murders himself. We disagree. Though charged as a principal, an

accused may be convicted on a theory of accountability if the evidence supports such a conviction. *People v. Touhy* (1964), 31 Ill. 2d 236, 201 N.E.2d 425; *People v. Heuton* (1971), 2 Ill. App. 3d 427, 276 N.E.2d 8.

Here, evidence that defendant and codefendant Steidl acted together in attacking and killing both victims supported the giving of the accountability instruction.

The Illinois Supreme Court has held that the fact the defendant might have been guilty of direct participation in a crime does not make the accountability instruction improper, as long as there was sufficient evidence that he aided another in the commission of the crime. (*People v. Stark* (1966), 33 Ill. 2d 616, 622, 213 N.E.2d 503, 506.) In *Stark*, the court found that the accountability instruction accurately expressed one of the theories on which the defendant could have been convicted and that there was adequate evidence to support it. In addition, this court has found that an accountability instruction may be given even where the defendant is tried alone. *People v. Wilkerson* (1984), 123 Ill. App. 3d 527, 463 N.E.2d 139.

██ Defendant's next objection concerning instructing the jury is that only two verdict forms should have been used, one finding the defendant guilty of both murders and the other acquitting him of both, instead of the four separate forms that were given to the jury. We note initially that defendant did not object to the verdict forms used at the time of the jury instructions conference and, although he raised the issue of a compromise verdict in his post-trial motion, he did not raise the question of the incorrect verdict forms. Thus, the alleged error is waived for purposes of this appeal. *People v. Johnson* (1984), 123 Ill. App. 3d 1008, 463 N.E.2d 877.

Nevertheless, we find no error to have occurred in using separate forms for each murder victim. Defendant was properly indicted on separate forms and was charged separately with each murder. The use of separate forms was not error.

██ Defendant next argues the court erred in denying his tendered instruction on the testimony of addicts. The introductory portion of the Illinois Pattern Jury Instructions in regard to "particular types of evidence" states a disapproval of instructions which comment on particular types of evidence as unduly emphasizing a particular aspect of the evidence. (Illinois Pattern Jury Instructions, Criminal, No. 3.00 (2d ed. 1981) (hereinafter IPI Criminal 2d), *McClellan*, 62 Ill. App. 3d at 595, 378 N.E.2d at 1225.) Exceptions are instructions concerning (1) statements of a defendant, (2) prior inconsistent statements of witnesses, (3) prior convictions of a witness, (4) prior convictions of a defendant who has testified, (5) defendant's commission of

certain other offenses, (6) evidence of a defendant's reputation, and (7) testimony of an accomplice testifying for the State, respectively. (IPI Criminal 2d Nos. 3.06—3.07, 3.11, 3.12, 3.13, 3.14, 3.16, 3.17.) The trial court properly recognized that an instruction on the testimony of addicts would unduly emphasize the evidence of addiction of several of the witnesses and properly refused the instruction. The court properly noted that other instructions enabled the jury to place proper focus on the testimony of those witnesses who had such an addiction.

Finally, defendant attacks the propriety of his sentence to *natural life imprisonment on two grounds.* They are the question of the constitutionality of the statutory scheme permitting the natural life sentence and the question of the propriety of imposing such a harsh sentence on a person having as severe an alcohol problem as did defendant.

Defendant attacks the constitutionality of the statutory provisions permitting the imposition of a sentence for natural life on a defendant between section 5—8—1(a)(1) of the Unified Code of Corrections (Unified Code), which permits imposition of a sentence to natural life of a murderer whose conduct in committing the offense is "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)), and section 5—8—2(a) of the Unified Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)), which, when combined with section 5—5—3.2(b)(2) of the Unified Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2)), merely authorizes a sentence of an extended term of imprisonment of not less than 40 years nor more than 80 years for a murder accompanied by such conduct. The apparent complaint of defendant is that the conflicting authorizations deprive a defendant so convicted of due process or equal protection because of unbridled discretion given to the sentencing court and because of confusion as to what the court should do.

In *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662, the appellate court upheld the foregoing statutory scheme. That court reasoned the discretion given to the court was not uncontrolled, because, regardless of which section the sentencing court decided to impose, the court was nevertheless required to consider factors in mitigation (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.1) and those in aggravation (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2). (See *People v. Bartik* (1981), 94 Ill. App. 3d 696, 703, 418 N.E.2d 1108, 1114; *People v. Merchel* (1980), 91 Ill. App. 3d 285, 295, 414 N.E.2d 804, 812.) We conclude that with the described limitations upon the court's

sentencing power, the sentencing court may properly choose between the statutory provisions as to which it may use in imposing punishment. That was properly done here.

The evidence at sentencing did show that defendant had a substantial alcohol problem. However, the defendant had a substantial prior criminal record, and the wounds inflicted on Karen Rhoads were far in excess of those necessary to kill her. The court was well within its discretion in imposing a sentence of natural life. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The conviction and the sentence of defendant are affirmed.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.