2021 IL App (2d) 180671-U
No. 2-18-0671
Order filed January 19, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-827 |
| DAVID A. WASZAK, | ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment.

**ORDER**

.

¶ 1    *Held*: Where the State, at defendant's trial on charges of sexual abuse of a fellow hospital employee while both were on duty, produced in rebuttal a police officer who testified on cross-examination that another individual had made similar allegations against defendant, defense counsel was not ineffective for not moving to strike the testimony, requesting a limiting instruction, or seeking a mistrial. While counsel's decision not to take action was prejudicial under *Strickland* given the closely-balanced evidence, counsel's decision was not unreasonable under *Strickland*, because counsel may have further damaged the defense case in the eyes of the jury by drawing attention to the testimony.

¶ 2    After a jury trial, defendant, David A. Waszak, was found guilty of four counts of

aggravated battery (720 ILCS 5/12-3.05(d)(ii) (West 2014)) and one count of criminal sexual

abuse (720 ILCS 5/11-1.50 (a)(1) (West 2014)). He was acquitted of a second count of criminal sexual abuse. The trial court denied his motion for a new trial and sentenced him to 24 months' probation. On appeal, he contends that his counsel was ineffective for failing to respond sufficiently to a rebuttal witness's reference to evidence that was not disclosed in discovery. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      On December 21, 2015, a grand jury returned a six-count indictment against defendant. At the time of the charged offenses, defendant was a respiratory therapist at Kindred Hospital (Kindred) in Sycamore. Natalie K. was a newly-hired nurse undergoing orientation. The four counts of aggravated battery charged that, on October 20, 2015, defendant, knowing that Natalie K. was a nurse on duty, made insulting or provoking contact with her by licking her ear (count I), rubbing his groin into her back and buttocks (count II), grabbing her buttocks (count III), and grabbing her breast (count IV). The two counts of criminal sexual abuse allege that, on October 20,2015, for the purpose of arousing himself sexually, defendant knowingly thrust his groin into Natalie K.'s back and buttocks (count V) and knowingly fondled her breast and buttocks (count VI).

¶ 5      On November 15, 2016, at a hearing, defendant's attorney, Kenneth Poris, told the court that Kindred was refusing to disclose information about potential witnesses. The court noted that Kindred could not be ordered to disclose information. The court would, however, require the State to disclose the names and addresses of the witnesses it planned to call. That day, the court entered a written order reading in part, "State to provide updated discovery by 12-13-16." On December 13, 2016, the State filed an answer to a defense discovery request. The answer listed, as one possible witness, Sycamore police officer Dana Allen. It continued, in part:

"[2.] (b) The following witnesses made written statements:

See tendered reports SAO-1 through SAO-29

* * *

(c) All memoranda reporting or summarizing oral statements made by witnesses are contained in the police reports tendered to the defense."

* * *

[5.] (b) ANY AND ALL ITEMS MENTIONED IN THE POLICE REPORTS SHALL BE MADE AVAILABLE TO DEFENSE COUNSEL FOR INSPECTION, TESTING, COPYING AND PHOTOGRAPHING SUCH MATERIAL AND INFORMATION AT ANY REASONABLE PRE-ARRANGED TIME.

* * *

15. The People have tendered all memoranda, police and scientific reports and other relevant documents in the State's possession at this time and the investigation will continue."

¶ 6   On June 19, 2017, defendant moved to bar the State from introducing evidence that, on an unspecified date, he touched a female nurse's buttocks with a clipboard. The trial court did not rule on the motion. Shortly before jury selection, however, Poris raised the motion and noted that the prosecutor, James Walsh, had told him that he did not intend to introduce the alleged incident. Walsh responded, "I'm not going to bring it up unless the door is opened." Also, Walsh moved to allow Natalie to remain in the courtroom after she testified. Walsh stated that he did not intend to call Allen, because "she couldn't testify to anything, since all she did was interview the victim." Defendant then acquiesced in Walsh's motion.

¶ 7   On August 14, 2017, trial began. The State first called Natalie K. On direct examination, she testified as follows. In September 15, 2015, she started work at Kindred. Orientation lasted

into October. During the first week of orientation, defendant gave a talk on respiratory therapy. During the second week, Natalie first spoke with defendant when she was at the nurses' station with a nurse who was training her. Defendant touched her wrist and kidded her about wearing a man's watch. She laughed, and it became a running joke.

¶ 8    Natalie testified that, on October 20, 2015, she was still orienting and was assigned to work with defendant. They started at 1 p.m. in a patient's room in the intensive care unit (ICU). There was no functioning door; a curtain was drawn when patient care was performed. The patient was comatose and on a ventilator. Natalie stood at the foot of the bed and defendant stood toward the head of the bed. He demonstrated suctioning the patient and she repeated the process. Next, defendant started to explain respiratory care. Natalie looked out the window and saw a fellow employee walking outside. Defendant asked her why she was distracted. She said, "[W]hy is he outside. Isn't he supposed to be working?" Defendant asked her, "[W]ould you like to give him a blow job[?]" She gave him a startled look. He said, "[D]o you like to give blow jobs. I—I hope that you do." She asked him why he wanted to know. He said to keep the conversation confidential, as he did not want to get anyone upset. They exited the room.

¶ 9    Natalie testified that, on their way to seeing other patients, an employee asked defendant to read a chart. Defendant and Natalie walked to the small lab in the ICU. It was an open area near the nurses' station, where several people were working. She stood a little behind him. As he explained the chart, he told her that he had been "very turned on" by their conversation in the first patient's room. He asked her if she "shave[d] all the way." She asked why he asked her that. He requested that she be quiet and come near. Thinking he was going to apologize, she leaned in. He licked her ear. She asked him why he did it. He said that he was sorry. She asked him whether he would like it if someone spoke to his young daughter that way. He did not respond. They left.

¶ 10    Natalie testified that she used a bathroom, then entered another patient's room. Defendant was there. She told him that she had just used the restroom. He said that he knew and that he had been hoping that she had "held it." He explained that he wanted her to "hold [her] pee" because it would give her "a more orgasmic experience." He said that he knew that she was not satisfied with her sex life and he could give her the pleasure that she was missing. She told him that she was a mother and did not think about things like that. He responded that he had used the bathroom and had masturbated; he ejaculated quickly because she was nearby. He added that he wanted to be naked with her. She told him that she had been sexually abused as a child and did not want to talk about the things he mentioned. Defendant's expression changed. He said that he was sorry, walked over to her, and hugged her.

¶ 11    Natalie testified that she and defendant left the patient's room, visited other patients, and entered the general floor. Here, each patient's room was joined to another room, with a bathroom in the middle. Because the next patient they saw was on isolation precaution, they had to wash their hands in the bathroom. Natalie entered and started to wash her hands. Defendant walked in after her, closed the door to each patient's room, and started to massage her hands. She pulled her hands away and started to dry them. He leaned in and grabbed her breasts with both hands. As she turned to leave, he grabbed her buttocks with both hands.

¶ 12    Natalie testified that she and defendant went to the next patient's room. Defendant explained how to change the patient's "trache[otomy tube] collar" and dressings. Natalie then performed the process, keeping one hand on the trache to steady it. As she started to remove the collar and dressing, defendant put his hand up the back of her scrub and started massaging her back. The patient's safety required her to keep her hand on the trache. He kept massaging her back. She told him to stop. He grasped her pants and pulled her closer. She kicked him three times; he

stopped. They saw another patient, and defendant did the same thing; Natalie told him to stop, and he did.

¶ 13    Natalie testified that, next, she and defendant went to the nurses' station so that he could explain charting to her. They sat down in front of a computer. At one point, he put his hand on hers and said that they should run away together to California. She took back her hand and said that she did not want that. He got closer and put his leg up against hers. A patient called out for a nurse, so Natalie went to his room. Defendant followed her there. He asked her what she was doing after work. She said that she was going to put her daughter to bed. He said that he wanted to take her out; she said that she had a boyfriend and was not interested. Defendant asked for her phone number. He walked up to her with a folded sticky note and put it into her pants pocket. The note had his phone number, and he told her to call him. Because it was the end of her shift, she gathered her things and went home. She did not report anything to anybody that day.

¶ 14    Natalie testified that at the start of the next day, she told her nursing supervisor, Chris Cardinale, what had happened the previous day. Cardinale arranged a meeting with the chief executive officer, James Cohick. Natalie met with Cohick, Cardinale, and Lauri Nadler, defendant's supervisor. She had no more to do with the case until October 30, 2015, when she met with the Sycamore police and wrote a statement.

¶ 15    Natalie testified that she waited until the next morning to report defendant's behavior, as she was very worried and scared. She was new and defendant appeared to be well-liked by their superiors. Her childhood experience of being abused also contributed to her hesitation.

¶ 16    Natalie testified on cross-examination that, before October 20, 2015, defendant had often said that he was moving to California soon. She never said that she would like to move there with him. She did not recall him mentioning a fiancée or a relationship with anyone in California.

¶ 17    Natalie testified that the ICU had four individual rooms located directly in front of the nurses' station. She could not recall the distance between the rooms and the station. Each room was separated by a curtain from the station. In the first room that Natalie and defendant visited, the patient was comatose and blind but responded to stimuli; it was unknown whether she could hear. The room had no door, only a curtain, and anyone could have walked in at any time. Natalie could not recall whether, after exiting the room, she and defendant went to the nurses' station to chart the patient. She could not recall whether the second room that they visited was in the ICU or on the general floor or whether it had a door. Asked about the third room, she testified, "I do not recall what happened in every single room that day." Natalie and defendant visited more than three rooms that day, but she could not recall the exact number. She could not recall how many of the rooms had ventilators. The ventilators were not the small newer ones, but the older kind, which were four feet tall and two feet wide and had to be wheeled around on carts.

¶ 18    Natalie testified that, when she and defendant were at the nurses' station at the end of the day, another nurse was charting there. He saw what was happening but kept charting. On October 20, 2015, Natalie left work sometime after 6 p.m. To her knowledge, there were no surveillance cameras in the hallways at Kindred.

¶ 19    Natalie testified that defendant was terminated on October 26, 2015. She found out very shortly afterward. On October 30, 2015, she spoke to the police. She did not go to the police sooner, because she was scared and did not know whether anybody would listen to her. At the police station, she told Officer Dana Allen that there were other women with whom defendant appeared to have acted inappropriately. Allen gave Natalie her business card and said to have the other individuals contact her. Natalie did not know how many of them contacted Allen. No other nurses ever told Natalie that they had talked to the police.

¶ 20    Natalie denied that she ever backed up into defendant's groin area or did anything else inappropriate to him.

¶ 21    Cohick testified on direct examination as follows. On October 21, 2015, he met with Natalie, Cardinale, and Nadler. On October 23, 2015, he met with defendant and Nadler for about an hour. Cohick asked defendant what had happened between him and Natalie three days earlier. Defendant said that they had several interactions in which their bodies touched. He put his hands on her back at one point. They also discussed orgasms, including how holding in urine increased the intensity of an orgasm. Defendant said that he raised this topic because it was "something he felt she should know within the context of what they were talking about." Cohick did not think that the remark was appropriate, and defendant admitted that it was unprofessional.

¶ 22    Cohick testified that he and Nadler asked some specific questions about the incidents that Natalie had reported. Defendant denied talking about oral sex or using the term "blowjob." He said that he had had the impression that Natalie was flirting with him; any contact was initiated by her getting closer to him. Defendant denied licking Natalie's ear, but admitted that he kissed her cheek. Cohick could not recall defendant explaining why he did this. Defendant said that he should have brought the matter to the attention of Cohick and Nadler.

¶ 23    Cohick testified on cross-examination that, between October 21 and October 26, 2015, he investigated whether anyone had witnessed Natalie and defendant interacting. He found nobody helpful. Cohick could not recall defendant ever telling him that he was trying to save Natalie's job because she was a new employee. The decision to terminate defendant was based on the unprofessional conduct that he admitted, not on Natalie's allegations alone. Kindred had no cameras or audio recording devices in its hallways.

¶ 24    Cohick testified that he took notes of his interview with Natalie. He shared the notes with Kindred's attorneys and the prosecutor. Cohick knew that defendant's attorneys had attempted to talk to Kindred employees about the alleged incidents. He was not sure whether he had ever learned that the attorneys had been refused permission. The trial concluded for that day.

¶ 25    The next day, Rod Swartzendruber, a Sycamore police officer, testified on direct examination as follows. On November 23, 2015, he was a detective in charge of investigations. He and Detective John Keacher visited defendant at his home. Defendant agreed to talk about the events with Natalie. The interview lasted between 30 minutes and an hour.

¶ 26    Swartzendruber testified that he asked defendant about October 20, 2015, and his termination. Defendant initially spoke for some time about his fiancée in California and his plans to move there. Swartzendruber asked him to focus on October 20. The first thing that defendant said was that Natalie had told him that she was excited about their "date." He then related that, in the first patient's room, he demonstrated suctioning, then stood behind Natalie as she repeated the process. At some point, she asked whether she was doing it right, and she pushed her butt back and rubbed it against his genitals. He told her not to do that, and he grabbed her hips and pushed her forward. The incident made him feel very uncomfortable, but he did not report it.

¶ 27    Swartzendruber testified that defendant said that the next thing to happen was that, after he exited the restroom, Natalie asked him whether he had been masturbating in there. The comment made him uncomfortable, but he did not report it. Next, Natalie spoke repeatedly about possibly moving to California and how they might live together. These comments also made defendant uncomfortable because she knew about his fiancée. The orientation continued without much more of concern. Defendant did not report anything to his supervisors at the end of the day; he did not want to see anyone get into trouble. But, near the end of the day, he slipped a note with his phone

number into Natalie's smock. He explained to the detectives that he did so because he wanted to talk to her about her behavior, but he wanted to do it outside work.

¶ 28    Swartzendruber testified that defendant said that, when Cohick told him that Natalie had made a complaint against him, he was shocked and surprised. Defendant said that, at one point, Natalie told him that she had low self-esteem and thought that she was overweight. He told her that she was a good person and that "any man would be lucky to have her." He told Swartzendruber that maybe he should not have made that comment, as he might have mistakenly led her to believe that he was personally interested in her.

¶ 29    Swartzendruber described defendant's demeanor as "somewhat arrogant and a little excited." At the end of the interview, Swartzendruber told defendant that everything that he said was "exactly the opposite of what Natalie had reported," which he found "very odd." Defendant had no comment.

¶ 30    Swartzendruber testified on cross-examination that at no time did defendant admit that he had done anything wrong, other than failing to report what happened. Defendant appeared proud that he had a fiancée in California and was excited to be moving there soon. He was not evasive. Although Swartzendruber told defendant that he was there to talk about his interactions with Natalie on October 20, 2015, he never told him her specific accusations against him.

¶ 31    The State rested.

¶ 32    Poris then told the court that, after the trial began, Brandi Swinson contacted defendant, who then contacted Poris and said that she wanted to testify for defendant. The court held a hearing at which Swinson underwent a *voir dire* and the State forwent any objection to her testimony.

¶ 33    On direct examination, Swinson testified that, on October 20, 2015, she was a nurse at Kindred. She had known defendant since 2010, when he started. She had known Natalie since well

before 2015. On October 20, 2015, in the afternoon, she saw Natalie and defendant by a nursing unit. Swinson approached them, and they engaged in small talk. Defendant said something, and Natalie "just giggled and kind of flirtatiously bumped him with her arm, kind of rubbed up against him." Defendant laughed and walked away. Swinson thought that Natalie's behavior was "overly friendly." She saw nothing unusual about defendant's response. Swinson saw nothing else of note between Natalie and defendant.

¶ 34    Swinson testified on cross-examination that she did not report Natalie's conduct, because she believed that, had defendant been offended, he would have reported it. Swinson had not known of defendant's interview with Cohick three days after the incident. Cohick did not approach her about the subject. She had not been aware that the police would be visiting Kindred. She never received a card telling anyone with relevant information to report it to the police.

¶ 35    Swinson testified that, between October 20, 2015, and the trial, she had not contacted Cohick, the police, or anyone other than defendant about the case. She declined to talk to Cohick because she had no influence and could not change what management had already done. She declined to talk the police, because her experience with them convinced her that it was pointless.

¶ 36    Defendant testified on direct examination as follows. He was born October 29, 1960. Before October 20, 2015, he was a respiratory therapist at Kindred in Sycamore. He met Natalie during the first week of orientation. During a conversation with her and several others, he mentioned that he was going to be married in the Big Bear area of California and was excited about moving there. A couple of days before he was to start training Natalie, she approached him and said that she had looked into changing her license to California and had examined the Big Bear real estate market. Defendant told her that he had no interest in her coming with him to California, as he had a fiancée there. She giggled, and they said no more about it.

¶ 37    Defendant testified that, the morning that his orientation with Natalie began, the wound-care nurse, with whom Natalie had been orienting, met with him and verified that Natalie could orient with him. Natalie came up to them "real giggly and flirty" and said, "[W]e're finally going to have our big date." The nurse and defendant looked at each other in puzzlement; defendant guessed that Natalie meant their orientation. Before starting orientation with defendant, Natalie never told him anything about her background.

¶ 38    Defendant testified that a nurses' station was in the middle of the ICU, with four rooms in front and two in back. On October 20, 2015, at approximately 1:15 p.m., he and Natalie met there and went through the orientation packet. After 30 or 40 minutes, they stepped onto the floor.

¶ 39    Defendant testified that the ICU rooms used a new type of ventilator, much smaller than the older kind that Natalie had said was in use then. The ICU rooms had doors that could not be closed unless the bed were moved; the only separation from the outside was the curtain. Nurses often entered ICU rooms while respiratory therapists were working with patients.

¶ 40    Defendant testified that, after they entered the first patient's room, he showed her the ventilator and other features, then demonstrated suctioning. Libby, the staff nurse in the ICU, was in the room then. Defendant stood between the bed and the window while Natalie stood on the other side of the bed between the bed and the wall. Natalie then repeated the process. After Libby had left, they sat down. He asked her whether she had any questions. Natalie said that she lacked confidence in what she was doing. She had personal problems; her boyfriend was mistreating her and her father had molested her when she was a child. Defendant tried to encourage her and told her to be confident in caring for patients. They left the room. Each went to a separate restroom, and they met up at the nurses' station in the ICU to do charting.

¶ 41    Defendant testified that, in the first room, he and Natalie never discussed sexual pleasure or similar matters. They spent about 30 minutes in the room.

¶ 42    Defendant testified that Libby and a technician were at the nurses' station. Defendant sat down and explained charting to Natalie, who sat next to him. They went to the next patient's room on the general floor. A nurse twice came in for short periods, but nobody else was there otherwise. The room had a door, but a bed would have to be moved to close it. There were two beds, but only one was occupied. Defendant performed suctioning and Natalie repeated the process. They then worked on changing the dressings around the patient's trachea. This had to be done by two people. Defendant and Natalie stood on opposite sides of the bed and did not make contact. They had no conversation on any sexual matter. Defendant then left and charted for the patient, per the protocol.

¶ 43    Defendant testified that he and Natalie next visited a room on the general floor. He had Natalie perform the suctioning first. They started on opposite sides of the bed, but, when the ventilator alarm went off, he moved to her side to turn the alarm off. As he leaned over, Natalie was bending over. She backed up and her buttocks made contact with his groin. He put his hands on her hips, pushed her away, and told her that her act was very unprofessional. She moved away from him and stood up.

¶ 44    Defendant testified that, in the first and third rooms, he and Natalie used the bathroom together. In the second room, he used the bathroom. At no time in any bathroom did he masturbate or touch Natalie's chest area. Defendant never spoke to her about orgasms or anything similar.

¶ 45    Defendant testified that, after exiting the third room, he and Natalie did the charting on the patient. They finished at about 6:30 p.m. Another patient's alarm light went off. Natalie and defendant went to his room. The patient was fully alert. After the patient did some talking, defendant handed Natalie a piece of paper with his phone number on it. He told her that they

needed to talk outside the hospital about how to behave on the job. He was referring to her pushing her buttocks into his groin. After dealing with the patient, defendant left to report and Natalie said that she was going to her locker. Defendant did not see her again that day. Throughout the day, Natalie never showed any fear of him.

¶ 46    Defendant testified that the next day, when he was off shift, he received a phone call from Cohick. Nadler was in on the call. Cohick told defendant that Natalie had made a complaint about him and that Cohick was trying to figure out the situation. In the meantime, defendant would be suspended. Defendant told Cohick that he had done nothing and did not know why Natalie had complained. At Cohick's request, defendant attended a meeting in Cohick's office the next day. With Nadler present, Cohick disclosed Natalie's accusations, which were consistent with her testimony. Defendant said that he did not do anything. Cohick asked why he did not report it (apparently meaning Natalie's misbehavior). Defendant said that he did not want to see Natalie lose her job. Therefore, he violated the procedure for reporting such incidents. Cohick said that defendant would be suspended until Cohick resolved the matter with his corporate superiors.

¶ 47    Defendant testified that, on October 27, 2015, he learned that he had been terminated. About a month later, two police officers visited him at his home. He spoke to them freely and voluntarily. One officer said that Natalie had made accusations against him. Defendant responded that he did not do anything. At the officer's request, defendant explained the orientation. The officer interrupted him at least four times to ask him what his relationship was with Natalie. Defendant told him that she was an orientee, he was her preceptor, and he had been training her.

¶ 48    Defendant testified that the officer told him that Natalie had accused him of touching her inappropriately. The officer asked him separately about each allegation. Defendant denied each one. He said that he did not push his pelvis into Natalie's buttocks but only pushed her away from

him with his hands after she leaned into him and moved her hips sideways. The officer responded that what defendant told him was exactly the opposite of what Natalie had told him.

¶ 49    Defendant testified on cross-examination as follows. He graded Natalie on the procedures, and she passed. There was a comment section on the grading form, where defendant could have noted that Natalie had behaved unprofessionally. He did not do so, because she was new and he did not want to see anything bad happen to her. He did, however, talk to her about the importance of acting professionally. He gave her his phone number so that they could discuss the matter outside the facility.

¶ 50    Defendant testified that he did not tell Cohick that he had told Natalie about enhancing orgasms by holding in urine. Cohick was mistaken in testifying otherwise. Cohick did ask him specific questions about his conduct with Natalie.

¶ 51    On redirect examination, defendant testified that, while he and Natalie were in the first patient's room, Libby entered several times to adjust equipment. After he and Natalie finished with the patient, he asked her how she was feeling about the process. She responded that she had numerous difficulties, including her boyfriend's emotional troubles.

¶ 52    On re-cross-examination, defendant testified that, in the third room, he had been holding onto the trache. When he walked around to silence the ventilator alarm, he had Natalie take hold of the trache. He wanted her to feel confident and he knew that, if she stumbled, he could immediately grab hold of the trache.

¶ 53    Defendant rested.

¶ 54    In rebuttal, the State called Allen, who testified on direct examination as follows. On November 4, 2015, she went to Kindred and met with Theresa Hove, Kindred's quality director,

and Nadler. She told them that, if there were any other potential victims or witnesses, they should have them contact her. Allen gave Hove and Nadler her card with her phone number and e-mail.

¶ 55    Defendant's cross-examination of Allen, in its entirety, was as follows:

> "Q. Did you ever receive any phone calls after you put out your cards?
>
> A. I did.
>
> Q. From whom?
>
> A. I received a phone call from another potential victim.
>
> Q. You never made a report on that, did you?
>
> A. I did.
>
> Q. You did?
>
> A. Yes. I made a supplemental report on that.
>
> Q. And when was that supplemental report done?
>
> A. The victim did not want to be involved in the case.
>
> Q. When you say another victim, of the same charges or different charges?
>
> A. It would have been similar charges.
>
> Q. Okay. But that person did not want to proceed. Is that correct?
>
> A. That's correct.
>
> Q. All right. That's all I have."

There was no redirect examination. The State rested.

¶ 56    Immediately after the alternate jurors were excused, Poris informed the court that, although Allen testified that she had made a supplemental report, the defense had never received it. The court asked Walsh whether he had a copy of the report. Walsh stated, "I thought all discovery was

tendered. I will look, but I don't know." The jury returned and found defendant guilty of counts I-V and not guilty of count VI.

¶ 57    Defendant moved for a new trial. His second amended motion, filed May 22, 2018, alleged in part that newly discovered evidence, summarized in affidavits by several former employees of Kindred, required a new trial. As directly pertinent here, the motion alleged as follows. Allen testified as a rebuttal witness, and the State must have known about the report that she mentioned on cross-examination. In pretrial discovery, the State never disclosed or tendered this report. This failure prejudiced defendant's ability to cross-examine Allen properly. It was only then that Allen revealed that she had spoken to the alleged second victim. The second amended motion stated, "A copy of the untendered report dated in March 2016 is attached hereto as Exhibit 'A.' " However, the record does not contain this exhibit.

¶ 58    The motion argued additionally that Allen was not a proper rebuttal witness, because her testimony on direct examination did not rebut anything that the defense had presented.

¶ 59    On July 23, 2018, the trial court heard the motion. There was no new evidence on the issue of Allen's supplemental report or the alleged second victim. In argument, Poris asserted, "Officer Allen was called as a rebuttal witness and a trap was laid because all I had were the first two reports which basically didn't say anything other than Officer Allen telling the victim that if you know of any other witnesses, have them come forward." Cohick had already testified that nobody did come forward, but then Allen testified about the supplemental report, written in 2016, which stated that another individual reported that defendant had victimized her. In response, the State argued that there was no evidence that anyone had provided Allen a written statement.

¶ 60    The court denied defendant's motion. The court's explanation addressed only the newly discovered evidence claim. The court said nothing about the State's alleged discovery violation or the contents of Allen's third report.

¶ 61    The court sentenced defendant to 24 months' probation. He timely appealed.

¶ 62                                    II. ANALYSIS

¶ 63    On appeal, defendant contends that his trial attorney, Poris, was ineffective for failing to respond sufficiently at trial to Allen's surprise revelation of other-crimes evidence that the State had improperly failed to disclose in discovery. Defendant does not assert that Poris was ineffective for eliciting the surprise testimony. However, he contends that, after Allen revealed the existence of the report and testified that a second person had accused defendant of "similar charges" to those at trial, Poris acted unreasonably in failing to object, move to strike testimony, request a limiting instruction, or move for a mistrial. Defendant argues that, as a result of Poris's inaction, the jury heard highly prejudicial other-crimes evidence that was all the more damaging because of its open-ended character and the fact that it was the last testimony that the jury heard. Defendant maintains that, because the evidence was closely balanced—essentially a classic "he said, she said" case—it is reasonably probable that, absent Poris's lapse, the result of the trial would have been different.

¶ 64    The State responds that defendant has shown neither deficient performance nor prejudice. On both scores, the State contends that the record does not establish that the prosecution violated any discovery rules by failing to disclose Allen's supplemental report, absent either any proof that Walsh knew of the report in advance or any pertinent written request. On the ineffectiveness claim specifically, the State focuses primarily on the prejudice prong. It contends that (1) the evidence was not closely balanced, (2) the other-crimes evidence was admissible under section 115-7.3(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3(a) (West 2016)), (3)

defendant failed to prove any prejudice from the alleged discovery violation, and (4) Allen was a proper rebuttal witness. On the performance prong, the State contends that it was reasonable for Poris to forgo objecting, requesting a limiting instruction, or moving for a mistrial, because doing any of those might only have increased the jury's attention to the allegedly damaging testimony.

¶ 65    We address defendant's claim of ineffective assistance under the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Defendant must show that (1) his counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, absent counsel's unprofessional errors, the result of the trial would have been different. *Id*. at 688, 694; *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 66    We begin by addressing defendant's contention that the State violated discovery rules by failing to disclose Allen's report, as defendant claims that Poris was ineffective in responding to that violation. Defendant relies in part on Illinois Supreme Court Rule 412(a) (eff. March 1, 2001), which reads, as pertinent here, "[T]he State shall, upon written motion of defense counsel, disclose to defense counsel *** the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements." Defendant concedes that his counsel did not make a written request for Allen's reports, but he contends that he had the right to rely on the trial court's November 15, 2016, order and the State's representation of December 16, 2013, that it had "tendered all memoranda, police and scientific reports and other relevant documents in the State's possession at this time and the investigation will continue." See *In re Julio C*., 386 Ill. App. 3d 46, 51 (2008) (State's answer to defendant's general discovery motion, in which State represented that all items listed in police reports would be available for inspection, entitled defense counsel to assume that specific item of evidence would be preserved and made available).

¶ 67    Defendant also notes that any obligation to disclose was a continuing one, requiring prompt notice to the defense of the discovery of any additional material or information, up to and during trial. Ill. S. Ct. R. 415(b) (eff. Oct. 1, 1971); *People v. Hendricks*, 325 Ill. App. 3d 1097, 1103 (2001). Finally, defendant argues that we may presume that Allen's supplemental report was, or should have been, within the State's control, because the police were obligated to provide the State "all investigative material, including *** reports and memoranda" that had been generated by or had come into the possession of the department. 725 ILCS 5/114-13(b) (West 2016).

¶ 68    We agree with defendant that there was a discovery violation. The State did not disclose Allen's supplemental report before trial (or at all). Although defendant did not file a written motion as such, he reasonably relied on the State's representation that it would update its discovery as ordered, and specifically on its statement, "*All* memoranda reporting or summarizing oral statements made by witnesses are contained in the police reports tendered to the defense." (Emphasis added.) Because Allen's "surprise" testimony was that an unnamed victim (and a potential, though not actual, witness) had made an oral statement to her, and the prosecution had disclosed nothing about this statement (such as any document mentioning the alleged victim's statement), a discovery violation is apparent.

¶ 69    We note further that, in the trial court, the State essentially conceded defendant's claim that he was entitled to the disclosure of Allen's supplemental report and any evidence of a second victim. In response to defendant's motion to bar evidence of the clipboard-to-the-buttocks incident, Walsh said that he would not raise the incident "unless the door [was] opened." Defendant's case did not open the door to that or any other incident and Walsh did not attempt to elicit evidence of such incidents from Allen on direct examination. In response to defendant's motion for a new trial, the State did not contend that either the alleged victim's statement to Allen or Allen's police report

was not subject to timely disclosure before trial. Instead, the State argued only that nobody had provided Allen a *written* report. Finally, although the trial court denied defendant's motion in its entirety, the court explained only its ruling on defendant's newly-discovered evidence claim. It did not explain its denial of defendant's discovery-violation claim. Also, the court did not mention defendant's claim that Allen had not been a proper rebuttal witness. Although this failure does not entitle us to reverse the rulings on these claims, it denies us insight into why the court exercised its discretion as it did, or even whether it consciously exercised discretion at all.

¶ 70    The State invites us to dispose of the issues on the ground that defendant did not satisfy the prejudice prong. Of course, as defendant must succeed on both prongs, we may reject his claim for failure to satisfy the prejudice prong alone. See *People v. Simpson*, 2015 IL 116512, ¶ 35. We note that defendant need only show a reasonable probability of a different result (*Strickland*, 466 U.S. at 694; *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008)). We discuss the State's arguments as they relate to both Poris's response to the discovery violation and his decision not to contest Allen's status as a rebuttal witness.

¶ 71    We begin with the State's assertion that the evidence of guilt was not closely balanced. As defendant notes, the State argues only that the evidence was legally sufficient. This, of course, is not the same thing. That the evidence was sufficient establishes only that defendant would not be entitled to an outright reversal based on reasonable doubt. Defendant does not claim that a reasonable jury had to find him not guilty, but only that a reasonable jury could have found him not guilty. And that claim applies separately to each charge of which he was found guilty.

¶ 72    We agree with defendant that this case was closely balanced. Essentially, it was a credibility contest between two witnesses, neither of whom was corroborated to any substantial degree. Although defendant made some admissions to Cohick and Swartzendruber, these

admissions were not to the charged offenses, which he consistently denied. No third party testified to seeing any of the interactions on which the charges were based. Only one independent witness, Swinson, testified to the interactions between Natalie and defendant on October 20, 2015, and her testimony favored defendant. Even aside from being directly contradicted by defendant, Natalie's testimony was arguably undermined (as defendant did argue) by her failure to remember numerous details, such as how many rooms they visited or in what order. In sum, this is "a classic case of closely balanced evidence" as the jury "was faced with two plausible versions of events that depended on witness credibility." *People v. Moore*, 2020 IL 124538, ¶ 52. The closeness of the evidence supports defendant's claim of prejudice as to both the surprise testimony and the calling of Allen as a rebuttal witness.

¶ 73    We next consider two State arguments that apply only to the discovery violation and the surprise testimony (and not to Allen's status as a rebuttal witness in general). The State argues that (1) the evidence about the alleged second victim would have been admitted anyway and (2) under the four-factor test of *People v. Robinson*, 157 Ill. 2d 68 (1993) and *People v. Woods*, 2011 IL App (1st) 091959, defendant has not shown prejudice.

¶ 74    On the first argument, the State observes that, under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2016)), in a case in which the defendant is accused of aggravated battery when the case involves sexual conduct (see 720 ILCS 5/11-0.1 (West 2016)), evidence of the defendant's commission of another such offense "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(a)(2), (b) (West 2016). The State notes that the admission of such evidence to prove propensity has been upheld and that similarity between the two offenses support

admission, as it means that the evidence is highly probative. See *People v. Theis*, 2011 IL App (2d) 091080, ¶ 66.

¶ 75    The State's argument misses the mark in several respects. First, defendant is not contending primarily that the evidence of the other offense was improperly admitted, but that it was admitted without giving him the opportunity to examine it beforehand and thus decide on the strategy to use against it. Second, the State overlooks that

> "In a criminal case in which the prosecution intends to offer evidence under [section 115-7.3], it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." 725 ILCS 5/115-7.3(d) (West 2016)).

The State cannot plausibly contend that the evidence would have been admitted anyway since compliance with section 115-7.3(d) was a prerequisite and there was no compliance.

¶ 76    Finally, at the most, section 115-7(b) made the other-crimes evidence *admissible* at the discretion of the trial court. *Id.* § 115-7.3(b). Under section 115-7(c), the court would still have to weigh the probative value against undue prejudice, considering the proximity in time to the charged offense, the degree of factual similarity to the charged offense, and other relevant matters. *Id* § 115-7.3(c). Section 115-7.3 hardly ensured that the court would have admitted the evidence under an exception to the generally strong disapproval of using other-crime evidence to prove propensity. See *Moore*, 2020 IL 124538, ¶ 45 ("prior conviction evidence generally has little probative value and creates a high risk of unfair prejudice to the defendant"). We shall not guess how the trial court would have balanced the statutory factors and ruled. The State's first argument specifically directed against the second-victim evidence fails.

¶ 77 We turn to the State's second argument regarding the discovery violation: that defendant has not established that the violation prejudiced him. The State notes that, in evaluating prejudice, "[a]mong the factors which [a] court considers *** are [(1)] the closeness of the evidence, [(2)] the strength of the undisclosed evidence, [(3)] the likelihood that prior notice could have helped the [defendant], and [(4)] the willfulness of the State in failing to disclose the new evidence." *Robinson*, 157 Ill. 2d at 81; *Woods*, 2011 IL App (1st) ¶ 27. Further, the State notes the general principle that a " 'defendant's failure to request a continuance upon learning of a discovery violation is a relevant factor to consider in determining whether the new evidence prejudiced the defendant.' " *Woods*, 2011 Il App (1st) ¶ 27 (quoting *People v. Heard*, 187 Ill. 2d 36, 63 (1999)). We disagree with the State that these factors militate against finding prejudice.

¶ 78 The first factor, the closeness of the evidence, has already been addressed. It favors defendant, not the State. The second factor, the strength of the undisclosed evidence, is ambiguous at most. Of course, we do not know precisely what the second victim said to Allen, so we cannot gauge the strength of the evidence very well. However, as noted, courts view other-offense evidence as having great potential for undue prejudice. Further, we agree with defendant that Allen's vagueness about his prior malefaction did not render the reference harmless. Not only did she testify that the act was "similar" to the ones charged, but, as defendant observes, the sheer open-endedness of the reference could have encouraged the jury to speculate about the (potentially horrible) thing(s) defendant did to the victim. See *People v. Emerson*, 97 Ill. 2d 487, 497 (1983). This was especially so because Allen used the term "similar charges," implying that the conduct was an apparent criminal offense and not merely bad behavior.

¶ 79 The third factor is also ambiguous, but disturbing. Witness credibility was crucial, and defendant was denied the opportunity to scrutinize not only Allen's report but also the background

and credibility of the unknown (to him) second accuser.[1] The fourth factor is also ambiguous. There is no firm basis to infer that the State deliberately withheld Allen's supplemental report. But it is difficult to see how, absent serious neglect, it could have overlooked the report, unless the police failed to make it available, in which event their conduct could militate in favor of defendant.

¶ 80    Finally, we do not agree with the State that, under the circumstances of this case, Poris's decision not to request a continuance favors finding that prejudice was insubstantial. Defendant is claiming that Poris performed unreasonably by failing to take sufficient measures immediately after eliciting the surprise testimony. His failure to request a continuance could easily be seen as wholly consistent with his alleged ineffectiveness. The general principle that a defendant's decision not to request a continuance tends to show a lack of prejudice presupposes that the decision was a reasonable trial strategy, but defendant's whole claim is that his attorney blundered.

---

[1] The State suggests that the accuser might have been the coworker whom defendant allegedly touched on the buttocks with a clipboard. This is plausible speculation, but no more. If correct, it might militate against a finding of surprise, since defendant was aware well before trial of the alleged incident and, indeed, was the party who moved to exclude evidence of it. We do not know this, however, and we do not have Allen's supplemental report in the record. Although any ambiguity resulting from this incompleteness in the record must be construed against defendant as appellant (*Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)), this principle cannot be stretched unreasonably. We cannot assume the identity of the second accuser, much less the character of the accusation. This is especially so since the jury did not hear any evidence of either but was told only that a second accuser had made "similar charges" against defendant.

¶ 81    We conclude that the State makes little headway in arguing that the discovery violation did not prejudice defendant. The closeness of the evidence and the placement of the surprise testimony strongly suggest otherwise. Because prejudice requires only a reasonable probability of a different result, we reject the State's argument, based on the multi-factor test, against finding prejudice from counsel's failure to do more in response to the discovery violation and the surprise testimony.

¶ 82    We turn to the State's argument against counsel's failure to contest (until after trial) Allen's appearance at all as a witness. Had Allen not testified at all, the testimony about the second accuser would never have been heard by the jury. The State contends, however, that, even had Poris contested Allen's rebuttal testimony in its entirety, the trial court would have ruled against him. The State reasons that Allen's testimony on direct examination was proper to rebut Swinson's testimony that she never received a card telling anyone with relevant information to report it to the police. Defendant counters that Allen's testimony did not rebut Swinson and that at most it was limited to a collateral matter, thus demonstrating a reasonable probability that, had Poris moved to do so, the trial court would have barred Allen's testimony.

¶ 83    The admission of rebuttal testimony is within the discretion of the trial court. *People v. Whitlock*, 174 Ill. App. 3d 749, 777 (1988). Rebuttal evidence is admissible to " 'explain, repel, contradict or disprove the evidence of the defendant.' " *People v. Westbrook*, 262 Ill. App. 3d 836, 853 (1992) (quoting *People v. Waller*, 67 Ill. 2d 381, 387 (1977)). A rebuttal witness may be called to contradict defense testimony on a material issue, but not testimony on a "collateral immaterial matter." *Id.* at 853. A rebuttal witness may also be called to impeach a defense witness. *Whitlock*, 174 Ill. App. 3d at 777. Here, Allen testified that she had told Hove and Nadler that they should request that any potential witness should contact the police. The State introduced Allen's testimony to contradict Swinson's testimony that she had never been notified that anyone with information

about the case should contact the police. The State's testimony to contradict Swinson's testimony that she had never been notified that anyone with information about the case.

¶ 84    We need not decide whether Allen's testimony on direct examination concerned a collateral immaterial matter. We agree with him that there was at least a reasonable probability that the trial court would have sustained an objection based on relevance. Allen's testimony did not contradict Swinson's testimony. There is no inherent inconsistency between Allen's testimony that she told Hove and Nadler to contact potential witnesses and Swinson's testimony that she never was contacted. The former might make the latter less probable, but no more. Thus, the probative value of the evidence was slight, and the trial court might have excluded it on that basis. See Ill. R. Evid. 403 (eff. Jan. 1, 2011) (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence). At most, Allen's testimony proved that Swinson was tardy in reporting what she saw occur between Natalie and defendant, and what she saw was not direct evidence of the truth or falsity of the charges. Thus, it was reasonably probable that the trial court would have granted an objection to Allen testifying as a rebuttal witness.

¶ 85    We conclude that defendant satisfied the prejudice prong of the *Strickland* test and that the judgment must be affirmed, if at all, on the basis that he did not satisfy the performance prong. Therefore, we turn to that issue, considering both counsel's decision not to respond more aggressively to the surprise testimony and his decision not to contest Allen's being called at all.

¶ 86    On the first score, defendant contends that there was no good reason to forgo any contemporaneous response to Allen's revelation that a second person had accused defendant of conduct similar to that for which he was on trial. (Whether the conduct would have been chargeable

as aggravated battery or the lesser charge, criminal sexual abuse, is of course unknown. Indeed, it is unknown whether the alleged conduct would have been chargeable as more than one offense.) The State responds that it was (or could have been) reasonable trial strategy to forgo moving to strike Allen's testimony or seeking a limiting instruction, to avoid emphasizing the prejudicial testimony and thus increase its effect on the jury. See *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 118.

¶ 87    Defendant replies that allowing Allen's testimony to come in without so much as a limiting instruction was not a reasonable strategy, given that other-crimes evidence carries great potential for undue prejudice and Allen's revelation was especially dangerous because it was the last evidence that the jury heard (see *People v. King*, 2019 IL 123926, ¶ 45) (motion to strike); *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52 (limiting instruction). Defendant contends further that the reasonableness of forgoing a motion to strike may depend on whether the prejudicial evidence is essentially superfluous, as opposed to potential corroboration for a State case that otherwise depends primarily on the testimony of one witness (*Gunn*, 2020 IL App (1st), ¶ 118; see *People v. Wright*, 65 Ill. App. 2d 23, 34 (1965)).

¶ 88    Although the issue is a close one, we cannot say that defendant has shown that Poris's decision to forgo a motion to strike or a limiting instruction was an unprofessional error. The surprise testimony was the last that the jury heard, but it was not as central, prolonged, or emotionally loaded like that in *King*, a murder case, in which the victim's father and sister described their reactions to learning of the victim's death. *King*, 2019 IL 123926, ¶ 45. Thus, counsel might reasonably have concluded that attempting to limit the damage would only emphasize to the jury that a second person had accused defendant of similar offenses. Whether this was the wiser strategy is not the issue.

¶ 89    We note that defendant specifically concedes that Poris's inadvertent elicitation from Allen that a second accuser spoke to her, and that she made a report of it, was not itself an unprofessional error. Defendant contends primarily that Poris's blunder was his failure to control the damage with some type of contemporaneous objection or motion. Defendant does briefly argue, however, that Poris also blundered by continuing to question Allen without knowing what she would say. Based on the transcript quoted earlier, this means asking the one question about "the same charges or different charges" and eliciting the response, "It would have been similar charges." We agree with defendant that it is hard to view this question as a reasonable trial strategy. However, although we have held that defendant established prejudice from Poris's *overall* handling of Allen's testimony and her appearance as a witness (insofar as this overall approach was substandard performance) we cannot extend this conclusion to the limited instance of the one question-and-answer exchange.

¶ 90    We turn finally to whether counsel committed an unprofessional error by failing to object to Allen's appearance as a rebuttal witness. As we noted, Allen's testimony on direct examination was tenuously relevant at best, and a timely objection to it might have succeeded. Defendant does not specifically argue, however, that counsel was ineffective for failing to move in advance of Allen's testimony to bar her as a rebuttal witness. He contends only that counsel was ineffective for failing to object timely to Allen's rebuttal testimony. We cannot say that counsel's decision not to emphasize Allen's testimony on direct after it came out was unreasonable. Not realizing what she would reveal on cross-examination, counsel could not foresee that Allen's testimony would become a matter of great concern. The very tenuousness of any connection between Allen's testimony on direct and any evidence in defendant's case cut two ways: against the propriety of admission, but also against the likelihood of prejudice—and thus the unreasonableness of forgoing any objection. It was reasonable to decide not to object to testimony that was tangentially relevant

to rebutting Swinson's testimony. Given the closeness of the evidence, we cannot say that Swinson's testimony was unimportant. But the case turned primarily on the extensive testimony of the complaining witness and defendant, which raised a credibility contest unlikely to be influenced by the lately-secured testimony of one who witnessed one incident that was not directly involved with the conduct on which the charges against defendant were based.

¶ 91    In sum, we hold that defendant's claim of ineffective assistance falls short, based on the performance prong of *Strickland*. Therefore, the judgment must be affirmed.

¶ 92                                III. CONCLUSION

¶ 93    For the foregoing reasons, the judgment of the circuit court of De Kalb County is affirmed.

¶ 94    Affirmed.